**FILED - GR**
May 24, 2016 3:17 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:__mkc__ SCANNED BY: ᴨͻ ⁵⁄²⁵⁄¹⁶

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES *EX REL.*
REZA SAFFARIAN AND
AUDREY THEILE,

Plaintiffs-Co-Relators,
-v-

ENCORE            REHABILITATION
SERVICES, LLC ("Encore"); NEXCARE
HEALTH      SYSTEMS,        LLC
("NexCare"); BAY SHORES NURSING
CENTER, LLC; DIMONDALE NURSING
CARE     CENTER,    LLC;   DURAND
SENIOR CARE AND REHAB CENTER,
LLC; EVERGREEN MANOR SENIOR
CARE    CENTRE,    LLC;   FAIRLANE
SENIOR CARE AND REHAB CENTER,
LLC; FAITH HAVEN SENIOR CARE
CENTRE,    LLC;   TARTAN   HEALTH
CARE CORP. (aka FISHER SENIOR
CARE    &     REHAB    CENTER);
CHAPLAINS,    INC.   (aka   FOUR
CHAPLAINS      NURSING     CARE
CENTER); HOLT SENIOR CARE AND
REHAB    CENTER,    LLC;   CHELSEA
HEALTH CENTER, LLC (aka LAHSER
HILLS CARE CENTRE); LAKEPOINTE
SENIOR CARE AND REHAB CENTER,
LLC; OAKPOINTE SENIOR CARE AND
REHAB     CENTER,    LLC;   SAGINAW
SENIOR CARE AND REHAB CENTER,
LLC; SCHNEPP INC. (aka SCHNEPP
SENIOR CARE AND REHAB CENTER);
SOUTH   LYON   SENIOR   CARE  AND
REHAB CENTER, LLC; WEST OAKS
SENIOR CARE AND REHAB CENTER,
LLC;(hereinafter referred to as "NexCare
SNF's") and JOHN DOE ENTITIES 1-650,

Defendants.

---

**1:16-cv-605**

CIVIL ACTION    NO.

Janet T. Neff - U.S. District Judge

Ellen S. Carmody - U.S. Magistrate Judge

SECTION: _____
MAGISTRATE: _____

JURY TRIAL REQUESTED

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2) and MCL §
400.610a(2)**

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT
## TRIAL BY JURY REQUESTED

NOW INTO COURT, through the undersigned counsel, comes Relators, Reza Saffarian and Audrey Theile, in the name of and on behalf of the United States of America, who submit this Complaint for Damages as follows:

## INTRODUCTION

1. This action arises under 31 U.S.C. § 3729 *et* seq., also known as the False Claims Act ("FCA"), to recover treble damages and civil penalties on behalf of the United States of America, arising out of Defendants' knowing violations of the FCA and unjust enrichment, as well as the United States' payments to Defendants by mistake.

2. As more fully alleged herein, this action arises out of Defendants' continuing scheme/s to defraud the United States of America  through the submission of false and fraudulent claims for payment for therapy services in skilled nursing facilities (SNFs) to Medicare and other federal health care programs ("collectively, the government").

3. The schemes date back to at least 2013 and are ongoing.

4. NexCare's fraudulent schemes exceeded $43 million in single damages to the government just in the 2014-2016 time frame.

5. Encore's fraudulent schemes exceeded $1.7 billion in single damages to the government just in the 2014-2016 time frame.

6. Claims were false and fraudulent because they were for therapy services that were unreasonable, unnecessary, unskilled, or non-existent. Specifically:

7. Defendants, acting jointly and/or through each other's agency, provided therapy services to patients which were unrelated to their individual medical needs, but rather

1

were scheduled for the purpose of obtaining the highest levels of Medicare reimbursement, as follows:

      a.     Encore established and implemented company-wide RUG utilization requirements for therapy program managers and their therapists at each SNF, which were designed to generate the highest levels of Medicare reimbursement and did not allow for customized treatment of patients based upon their medical needs.

      b.     Encore set the therapy schedules of all newly admitted patients to the Ultra High RUG category, requiring that 70% of all patients be on Ultra High RUG category and that 25% of all patients be on the Very High RUG category.

      c.     Encore presumptively placed patients on the highest therapy reimbursement level, Ultra High RUG, rather than relying on individualized evaluations to determine the level of care most suited to each patient's clinical needs, in contradiction to Medicare regulations that only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury" be provided.

      d.     Medicare regulations specifically say that the Ultra High RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."

      e.     Encore scheduled therapy treatments at a minimum rate of seven hundred and twenty (720) minutes per week to meet the Ultra High category to patients who not only did not need this amount of treatment but who could not tolerate it.

8.      Encore established and implemented a company-wide mandate that at least 40%
of all Medicare Part B patients receive Encore therapy.

      a.      In order to accomplish this 40% mandate, Encore encouraged its therapist
to troll the long-term care patient population at the facilities by examining their
medical records to find patients to evaluate.

      b.      Encore's artificial metric of 40% requirement is entirely unrelated to
patient needs and effectively results in a significant number of patients being
placed in therapy who do not need it and who should not have been placed in
therapy.

      c.      Medicare requires that a physician or certain other practitioners certify that
the conditions imposed by Medicare are met at the time of a patient's admission
to the Skilled Nursing Facility (SNF). 42 U.S.C. Sec. 1395f(a)(2)(B).

      d.      In the case of Encore's trolled patients, Medicare's certification
requirement was not obtained.

9.      Defendants established and implemented a minimum Average Daily RUG rate
("ADR") of $500 which required the placement of all new admittees at the Ultra High
reimbursement levels.

      a.      The ADR is calculated at the end of each month by dividing the total
amount billed to Medicare for the month by the number of RUG days for that
month.

      b.      In order to meet the Average Daily Rug rate of $500, all new admittees
have to be placed at the Ultra High reimbursement levels.

10.    NexCare purposefully delayed discharge of patients even after their therapists had completed the therapies, for the purpose of increasing Medicare reimbursements.

11.    Encore purposely shifted the number of minutes of planned therapy between different therapy disciplines (i.e. physical, occupational, and speech) for the purpose of ensuring the defendants' company goals of reimbursement levels were achieved, regardless of the clinical need for the therapy.

12.    Encore established and implemented company-wide "productivity" requirements for the therapists that they be "a minimum of 85% productive". In the case of COTA (certified occupational therapy assistants), PTAs and per diem staff, Encore's "productivity" requirement was 90%.

    a.    "Productive," as used by Encore, has a specific meaning—that from the moment the therapist walks into the SNF, the therapist must be conducting Medicare billable treatments on the patient.

    b.    The workday for Encore therapists is eight (8) hours. Overtime is not allowed unless a regional supervisor allows it. An 8-hour day is four hundred and eighty (480) minutes. 85% of four hundred and eighty (480) minutes is four hundred and eight (408) minutes of therapy time. This leaves 15% of the four hundred and eighty (480) minutes during the day or seventy-two (72) minutes of "non-productive" time. If a therapist takes two fifteen (15) minute breaks, as allowed by Encore, this leaves forty-two (42) minutes of "non-productive" time.

    c.    Encore's productivity requirement pressures the therapists to write reports and perform a myriad of other duties when they should be conducting therapy.

4

d.    Encore's productivity requirement has other damaging effects on proper

patient care.

13.    During periods of short staffing, Encore purposefully reduced the treatment

minutes for those patients scheduled to come off service, before they reached their

assessment window (ARD), regardless of their medical needs and resulting in Encore

receiving Medicare reimbursements for therapy minutes it did not render.

14.    NexCare purposefully delayed patient discharges through the creation of an

artificial 7-day notice by therapists prior to discharge, as well as a Wednesday cut-off day

for putting in 7-day notices. When NexCare's discharge deadlines were not met, even by

one day, the patient was required to be kept in the facility anywhere from seven (7) to

twelve (12) unnecessary therapy days, regardless of medical necessity and even when the

patients are not making any progress in their therapy sessions.

15.    Defendants purposefully billed for therapy services not provided.

## JURISDICTION AND VENUE

16.    Under §3732 of the FCA, this Court has exclusive jurisdiction over the actions

brought under the FCA.  Furthermore, jurisdiction over this action is conferred on this

Court by 28 U.S.C. §1331 because this civil action arises under the laws of the United

States.

17.    This Court has supplemental jurisdiction over all other claims set forth in this

Complaint because these claims are so related to the claims arising under the federal

False Claims Act that they form part of the same case or controversy.  28 U.S.C. §1367.

18.    Venue is proper in this district pursuant to §3732(a) of the Act, which provides

that any action under §3730 may be brought in any judicial district in which the

Defendant or in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any act proscribed by §3729 occurred. Acts that are the subject of this action occurred in the State of Michigan, within this judicial district, as well as nationwide.  At all times material thereto, Defendants regularly conducted substantial business within the State of Michigan, maintained permanent employees in the State of Michigan, and made, and is making, significant sales and claims for reimbursement within the State of Michigan within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1)-(2).

## FILING UNDER SEAL

19.     Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.

20.     As required by the FCA, Relators voluntarily submitted prior to the filing of this Complaint a confidential written disclosure statement (subject to the attorney client and common interest privilege) to the United States Government, containing materials, evidence, and information in their possession pertaining to the allegations contained in this Complaint.

## THE PLAINTIFFS

21.     The Plaintiff, the United States of America by and through its department, the Department of Health and Human Services ("HHS"), through the Center for Medicare Services ("CMS") within the HHS, is responsible for administering Federal Health Care Programs including Medicare.

22.    Medicare is the nation's health program for persons over 65 years of age and the disabled.  Medicare is funded by the federal government. Medicare Part B has long covered outpatient prescription drugs that are provided through a patient "incident to" a physician's services. See 42 USC § 1395x(s)(2)(A).  Commencing on January 1, 2006, Medicare Part D provides comprehensive outpatient prescription drug coverage for brand name and generic drugs according to National and Local Coverage Determinations.  See Medicare Prescription Drug Improvement and Modernization Act of 2003, Pub. L. 108-173.

23.    HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

24.    The Department of Defense ("DOD") administers the TRICARE health care program for active duty and retired members of the uniformed services, their families, and survivors. TRICARE benefits include comprehensive prescription drug coverage.

25.    Upon information and belief, the Defendants derive a substantial portion of their revenue from the Medicare Program and Tricare health program.

## THE DEFENDANTS

26.    Defendant, Encore Rehabilitation Services LLC, (hereinafter referred to as "Encore") is headquartered at 33533 West 12 Mile Road, Suite 290, Farmington Hills, MI 48331. Encore provides physical therapy, speech therapy and occupational therapy services to hundreds of skilled nursing facilities across several states, including: Michigan, Ohio, Florida, Pennsylvania, Maryland, Virginia, Kentucky, Georgia,

Nebraska, Iowa, Missouri, Colorado, Rhode Island, Wisconsin, Connecticut, Tennessee, Massachusetts, South Carolina, and North Carolina. This may not be a complete list.

27.     Encore services 650 SNFs nationwide, including but not limited to a number of Michigan facilities managed on behalf of Encore by Greg Raymond.

28.     On April 6, 2014, Encore announced the acquisition of Evergreen Rehabilitation, LLC, Select Medical Rehabilitation Services, Inc., and Metro Therapy, Inc., adding significant scale and reach to Encore.

29.     Defendant, NexCare Health Systems, LLC, (hereinafter referred to as "NexCare") is headquartered at 10503 Citation Drive, STE 100, Brighton, MI 48116. NexCare provides nursing and, through Encore, provides physical therapy, speech therapy, and occupational therapy services to sixteen (16) skilled nursing facilities throughout central and south lower Michigan.

30.     Defendant, Bay Shores Nursing Center, LLC is located at 3254 E. Midland Rd., Bay City, MI 48706.

31.     Defendant, Dimondale Nursing Care Center, LLC is located at 4000 N. Michigan Rd., Dimondale, MI 48821.

32.     Defendant, Durand Senior Care and Rehab Center, LLC is located at 8750 Monroe Rd., Durand, MI 48429.

33.     Defendant, Evergreen Manor Senior Care Centre, LLC is located at 111 Evergreen Rd., Springfield, MI 49037.

34.     Defendant, Fairlane Senior Care and Rehab Center, LLC is located at 15750 Joy Rd., Detroit, MI 48228.

35.     Defendant, Faith Haven Senior Care Centre, LLC is located at 6531 W. Michigan Ave., Jackson, MI 49201.

36.     Defendant, Tartan Health Care Corp. (referred to as Fisher Senior Care and Rehab) is located at 521 W. Ohmer Rd, Mayville, MI 48744.

37.     Defendant, Chaplains, Inc. (referred to as Four Chaplains Rehab) is located at 28349 Joy Rd., Westland, MI 48185.

38.     Defendant, Holt Senior Care and Rehab Center, LLC is located at 5091 E. Willoughby Rd., Holt, MI 48842.

39.     Defendant, Chelsea Health Center, LLC (referred to as Lahser Hills Care Centre) is located at 25300 Lahser Rd., Southfield, MI 48033.

40.     Defendant, Lakepointe Senior Care and Rehab Center, LLC is located at 37700 Harper Ave, Clinton Twp, MI 48036.

41.     Defendant, Oakpointe Senior Care and Rehab Center, LLC is located at 18901 Meyers Rd., Detroit, MI 48235.

42.     Defendant, Saginaw Senior Care and Rehab Center, LLC is located at 4322 Mackinaw Rd., Saginaw, MI 48603.

43.     Defendant, Schnepp Inc. (referred to as Schnepp Senior Care and Rehab Center) is located at 427 E. Washington St., St. Louis, MI 48880.

44.     Defendant, South Lyon Senior Care and Rehab Center, LLC is located at 700 Reynold Sweet Pkwy, South Lyon, MI 48178.

45.     Defendant, West Oaks Senior Care and Rehab Center, LLC is located at 22355 West 8 Mile Rd., Detroit, MI 48219.

46.     Defendant(s), John Doe(s) 1-650, are those additional entities, including SNFs, which are serviced or managed by Encore or an Encore affiliate that engaged in the fraud schemes outlined herein.

## THE RELATORS

47.     Relator Reza Saffarian ("Relator Saffarian") is a person of the full age of majority, a resident of the State of Michigan, and a current employee of Defendant, Encore.

48.     Relator Saffarian began his employment with Encore in April 2013, when NexCare contracted with Encore to provide therapy services to its SNFs, including Bay Shores.

49.     Prior to April of 2013, Relator Saffarian had been at Bay Shores for fifteen (15) years as  Area Manager for Integrity Rehab Services, Encore's predecessor, from June 2005-April 2013.

50.     Between April 2013 and April 8, 2016, Relator Saffarian was the on-site Therapy Program Manager for Encore at the Bay Shores Senior Care and Rehab, 3254 E. Midland Road, Bay City, Michigan 48706-2835.

51.     On April 8, 2016, Encore and NexCare jointly retaliated against Relator Saffarian for his protected activity; to wit, advancing the instant case and refusing to participate in the fraudulent activities of Defendants, by removing him from his position at Bay Shores and demoting him to an occupational therapist ("OT") at a lesser pay and at a facility located more than one hour and forty-five minutes from his home in Saginaw, Michigan.

52.     As Therapy Program Manager for Encore, Relator Saffarian's job duties included supervision of sixteen (16) full time therapy staff as well as per diem personnel;

scheduling patients daily for therapy upon admission and on an ongoing basis; overseeing discharge issues; compliance with company policies and procedures; and overseeing safety issues as they relate to patient health and safety concerning the therapies rendered by his staff.

53.     Relator Saffarian is an original source of the facts and information hereinafter set forth which are based on Relator Saffarian's personal observation and documents and information in his possession, all of which were acquired by him in the ordinary course of his work as the Therapy Program Manager for Encore at NexCare's BayShore SNF.

54.     Relator Audrey Theile ("Relator Theile") is a person of the full age of majority, a resident of the State of Michigan, and a current employee of Encore.

55.     Relator Theile is a Registered Occupational Therapist ("OT") who has worked at Bay Shores since 2005.  She was hired by Encore in 2013 and is still employed there.

56.     Relator Theile obtained her Bachelor Degree of Occupational Therapy at Baker College.

57.     Relator Theile is an original source of the facts and information hereinafter set forth which are based on Relator Theile's personal observation and documents and information in her possession, all of which were acquired by her in the ordinary course of her work as a Registered Occupational Therapist for Encore.

## LEGAL BACKGROUND

58.     Pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A), a cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

11

59.     Liability also arises under 31 U.S.C. §3729(a)(1)(B) when a person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

60.     As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is necessary.  *Id.*

61.     FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than five thousand and five hundred dollars ($5,500) and up to eleven thousand dollars ($11,000) for each such claim, and three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to be awarded between fifteen (15) to thirty (30) percent of the amount recovered.

62.     If a person other than the Attorney General brings suit, the complaint must remain under seal and defendants must not be served until the later of ninety (90) days after the service of the complaint or any extension of the ninety (90) days that is requested by the Attorney General and granted by the court.

63.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

64.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

65.     Subject to certain conditions, Medicare Part A covers up to 100 days of care in a SNF for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

66.     Among the conditions that Medicare imposes on its Part A SNF benefit are that: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis, (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis, and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

67.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and re-certify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

68.     To be considered "skilled," a service must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," 42 C.F.R. § 409.32(a), such as physical therapists, occupational therapists, or speech pathologists. *See* 42 C.F.R. § 409.31(a).

69.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitious exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d). "Many skilled nursing facility inpatients do not require skilled physical therapy services but do require services, which are routine in nature. Those services can be performed by supportive personnel; e.g. aides or nursing personnel . . . ." Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1.

70.     Medicare Part A covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A). In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

71.     In order to make it possible to assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period. 42 U.S.C. § 1395g(a).

72.     In order to submit claims to Medicare, each SNF must submit a Medicare

Enrollment Application in which the SNF certifies, among other things, that:

I agree to abide by the Medicare laws, regulations and program instructions that apply to
this provider. . . . I understand that payment of a claim by Medicare is conditioned upon
the claim and the underlying transaction complying with such laws, regulations, and
program instructions (including, but not limited to, the Federal anti-kickback statute and
the Stark law), and on the provider's compliance with all applicable conditions of
participation in Medicare.

*See* CMS Form 855A.

### Medicare Reimbursement for SNF Care

73.     Under its prospective payment system ("PPS"), Medicare pays SNFs a daily rate

for each day of skilled nursing and rehabilitation services provided to a patient.  *See* 63

Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

74.     The SNF daily rate is based, in part, on the patient's anticipated "need for skilled

nursing care and therapy."  *Final Rule for Medicare Program's Prospective Payment*

*System and Consolidated Billing for Skilled Nursing Facilities*, 64 Fed. Reg. 41,644 (July

30, 1999).

75.     Specifically, the daily PPS rate that Medicare pays a SNF depends on the

Resource Utilization Group ("RUG") to which a patient is assigned, and each distinct

RUG is intended to reflect the anticipated costs associated with providing nursing and

rehabilitation services to beneficiaries with similar characteristics or  resource needs.

76.     There are five general rehabilitation RUG levels for those beneficiaries that

require rehabilitation therapy:  Rehab Ultra High (known as "RU"), Rehab Very High

("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").

77.     The rehabilitation RUG level to which a patient is assigned depends upon the

number of skilled therapy minutes and the number of therapy disciplines the patient

received during a seven-day assessment reference period (also known as the "look back period").

78.    The chart below reflects the requirements for the five general rehabilitation RUG levels and the corresponding daily reimbursement ranges:

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Daily Reimbursement Range[1] |
|---|---|---|
| Ultra High (RU) | at least 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $512.75 — $869.42 |
| Very High (RV) | Between 500 and 719 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $466.28 — $786.66 |
| High (RH) | Between 325 and 499 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $375.71 — $722.91 |
| Medium (RM) | Between 150 and 324 minutes per week total therapy; therapy must be provided at least 5 days per week but can be any mix of disciplines | $324.26 — $668.30 |
| Low (RL) | minimum 45 minutes per week total therapy; therapy must be provided at least 3 days per week but can be any mix of disciplines | $263.76 — $431.05 |

[1](These rates were for SNFs in urban areas.  The specific reimbursement amount within each range depended on additional factors, including the patient's ability to perform certain activities of daily living such as eating and toileting, and the patient's need for extensive services such as intravenous treatment, or ventilator or tracheostomy care).

74 Fed. Reg. 40,288, 40,332 (Aug. 11, 2009); 75 Fed. Reg. 42,886, 42,894 (July 22, 2010).

79.    The Ultra High RUG level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

80.    In announcing the final PPS rule for SNFs, the Centers for Medicare and Medicaid Services ("CMS") further explained that the RUG system "uses minimum levels of minutes per week as qualifiers . . . . These minutes are minimums and are not to be used as upper limits for service provisions. . . . Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements . . . and will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

81.    A nursing facility must determine each patient's RUG as of specific "assessment reference dates" ("ARDs"), and the RUG as of the ARD then determines the daily reimbursement rate prospectively for a specific timeframe.

As of 2011, the Medicare assessment schedule was as follows:

| RUG Assessment Type | Assessment Reference Date Window (including grace days) after 10/1/11 | Medicare Payment Days Determined by RUG |
| --- | --- | --- |
| 5 day | Days 1-8 | Days 1-14 |
| 14 day | Days 13-18 | Days 15-30 |
| 30 day | Days 27-33 | Days 31-60 |
| 60 day | Days 57-63 | Days 61-90 |
| 90 day | Days 87-93 | Days 91-100 |

76 Fed. Reg. 26,364, 26,389 (May 6, 2011).

82.    SNFs report therapy treatment times for each assessment reference period on a Minimum Data Set ("MDS") form that is completed as of each ARD in a patient's stay. *See* 64 Fed. Reg. at 41,661; 42 C.F.R. § 413.343.

83.    Prior to October 1, 2010, SNFs electronically transmitted the MDS form to a state's health department or other appropriate agency, which in turn transmitted the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008).  Since October 1, 2010, SNFs transmit the data directly to CMS.  42 C.F.R. § 483.20(f)(3). Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265.

84.    The MDS form requires a certification by the provider stating, in part:  "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening.

85.    A patient's RUG information is also incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code must be included on the CMS-1450 form, which SNFs submit monthly to Medicare via intermediaries known as Medicare Administrative Contractors that process and pay Medicare claims.  Medicare Claims Processing Manual, Ch. 25, § 75.5.

86.    Prior to the commencement of therapy in any discipline, therapists certified in that discipline must evaluate the patient and develop a treatment plan that is approved by a physician. *See* 64 Fed. Reg. at 41,660-61; 42 C.F.R. §§ 409.17, 409.23.

18

87.     The therapy time reporting rules make clear that "[t]he time it takes to perform the formal initial evaluation and develop the treatment goals and the plan of treatment may not be counted as minutes of therapy received by the beneficiary." 64 Fed. Reg. at 41,661; *see also* RAI Manual, Ch. 3 at O-19 (Oct. 2014) ("The therapist's time spent on documentation or on initial evaluation is not included.").

88.     HHS has explained that "[t]his policy was established because we do not wish to provide an incentive for facilities to perform initial evaluations for therapy services for patients who have no need of those specialized services." 64 Fed. Reg. at 41,661. The purpose, however, is not to deprive providers of compensation for performing initial evaluations, because "the cost of the initial assessment is included in the payment rates for all Medicare beneficiaries in covered Part A SNF stays." *Id.* at 41661-62.

89.     Concurrent therapy is the treatment of two residents at the same time who are not performing the same or similar activities. *See* 74 Fed. Reg. at 40,315. Until October 1, 2010, if a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a SNF could attribute 60 minutes to each patient when determining each patient's RUG level.

90.     Effective October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if sixty (60) minutes of concurrent therapy were provided, the SNF could attribute only thirty (30) minutes to each beneficiary. *Id.* at 40,318-19.

91.     In group therapy, a single therapist conducts the same or similar therapy exercises with two to four beneficiaries at the same time. *See* 76 Fed. Reg. 48,486, 48,516 (Aug. 8, 2011) (clarifying that, after October 1, 2011, group therapy must be planned for four patients). Group therapy should be initiated only after determining that

the patient can benefit from therapy provided in a group setting and that the group therapy provided is necessary and appropriate for the patient. 76 Fed. Reg. at 48,514. "Therapists should document how the prescribed type and amount of group therapy will meet the patient's needs and assist the patient in reaching the documented goals." *Id.*

92.     Effective October 1, 2011, the group therapy time-reporting rules changed: under the new rules, group therapy must be intended for four patients, and the relevant MDS form for each of those patients should reflect one-fourth of the total time spent by the therapist in the group session. *See* 76 Fed. Reg. at 48,513-14.

93.     Effective October 1, 2011, the Medicare rules further imposed a requirement that SNFs report a so-called Change of Therapy ("COT") if, after an assessment for a particular patient, "the intensity of therapy (that is, the total reimbursable therapy minutes . . .) changes to such a degree that it . . . no longer reflect[s] the RUG classification and payment assigned" for that patient. 76 Fed. Reg. at 48,518. Specifically, at the end of each 7-day period after an assessment, if the therapy delivered during that period does not match the last reported RUG, then the SNF must report the actual level of therapy being delivered in a COT, and the reimbursement for that patient's care will be adjusted accordingly. *See id.* at 48,518-26. For practical purposes, this change turned every week into a new look back period.

94.     At the end of each day, Encore Therapists enter their charges in the company computer software and that information is used by NexCare and its nursing facilities as the basis for billing Medicare and other payors for those patients who received treatment from Encore's therapists.

95.     Each SNF has its own National Provider Identifier (NPI) for Medicare, which is used, with all invoices submitted for reimbursement from Medicare.

## COMPANY WRONGDOING

### General Background

96.     NexCare Healthcare Systems LLC, oversees and controls the operations of the SNFs by and through the employees there as well as through its regional supervisors. It creates corporate practices and procedures and implements them via regional directors who communicate with the NexCare administrators who manage the SNFs.

97.     Encore provides its therapy services to all of the NexCare SNFs in the State of Michigan.

98.     The terms of the relationship between Encore and NexCare and the named SNFs are governed by written agreements. Although the Relators do not have and have not seen copies of those Agreements, they have both been told by Encore's Regional Supervisors that NexCare imposes RUG utilization requirements on Encore including the scheduling of patients with minimum RUG Ultra High and    Very    High    RUG    levels    and minimum Patient Pay Amount per day ("PPD") amounts.

99.     In addition, Relator Saffarian has been informed that the Agreement between Encore and NexCare and its facilities has a provision that allows the various facility administrators to request removal of any Encore employee from the SNFs.

100.    NexCare employs nurses and other medical providers to oversee patient care, evaluate patient medical conditions and attend to their needs in accordance with medical standards in their particular field. In addition, the medical providers update and maintain documentation on the patients they monitor, including medication records, and vital signs including oxygen saturation levels, blood pressure, weight, and temperature.

101.    When a patient is sent to a NexCare SNF, they undergo an admission process, which requires an exchange of information. Once that happens, a patient is screened and evaluated by one or more Encore therapists and a plan of care for the patient is entered into the company computer software.

### Encore, NexCare and NexCare SNFs submitted claims for unreasonable, unnecessary or unskilled therapy services

102.    At each NexCare SNF, Encore typically employs an on-site manager (known as a Therapy Program Manager), physical therapists, occupational therapists, speech-language pathologists, and assistants.

103.    Therapy Program Managers report to Regional Vice Presidents, who oversee the rehabilitation programs in a number of skilled nursing facilities in a geographic region and report to individuals in higher levels of management at Encore.

104.    When Relator Saffarian was working at Bay Shores for Encore, he reported to Greg Raymond, Regional Vice President for Encore, whose office is located at the corporate headquarters in Farmington Mills Michigan. Mr. Raymond oversees a number of other SNFs serviced by Encore.

105.    Relator Saffarian spoke with Mr. Raymond several times per week by phone, submitted weekly reports which were closely reviewed by Mr. Raymond, and attended monthly meetings along with the other Therapy Program Managers supervised by Mr. Raymond at the corporate headquarters.

106.    At those corporate meetings, Mr. Raymond reviewed the performance of each SNF based upon monthly reports and inquired as to why company requirements pertaining to the fraudulent conduct at issue here were not met.

107.    After each newly admitted patient was evaluated by a licensed therapist, plans of care were written by the therapists where an Encore Therapy Program Manager determined a RUG level for the patients and plotted treatment schedules so that the planned RUG level could be achieved.

108.    Those plans of care did not specify the number of minutes of therapy a patient should receive based upon their individual medical needs.

109.    The treatment schedules were not related to the patient needs or the therapist evaluations of the patient, but rather were designed to obtain certain "RUG" levels based on Encore company-wide requirements for those levels of care, all of which are financially driven.

110.    During the entire period of time that Relator Saffarian was Therapy Program Manager, he was specifically instructed to automatically place each patient in the Ultra High RUG category and this required the patients to have a minimum of seven hundred and twenty (720) minutes of therapy per week.

111.    Relator Theile acted as Therapy Program Manager when Relator Saffarian was on vacation and her experience was identical as to this placement protocol.

112.    Relator Theile was given the same instructions to automatically place each patient in the Ultra High RUG category and this required the patients to have a minimum of 720 minutes of therapy per week.

113.    Encore's mandates and related RUG utilization requirements were stringently implemented and applied requirements for therapists.

114.    These mandates and RUG utilization requirements were designed to obtain the highest levels of reimbursement from the government and were used to evaluate its Therapy Program Managers and therapists.

115.    One such enforced mandate required that Therapy Program Managers achieved fixed RU% percentages of patient placements on Ultra High and Very High RUG levels in any given period.

116.    Encore's stated policy was that no group would be allowed raises unless they met the company's utilization percentages for UH and VH RUGS, as well as other therapist "productivity" requirements of 85%, as further explained below.

117.    Because Relator Saffarian's group did not meet said requirements for the last three (3) years, Relator Saffarian and the therapists he supervised did not receive any pay raises in 2014, 2015 or 2016.

118.    The foregoing schemes were deployed by Defendants on a company-wide basis.

**Encore, NexCare and the SNFs mandated that 70% of patients be at "Ultra High" and 25% of Patients be at "Very High" regardless of medical need**

119.    Defendants mandated that the Therapy Program Managers at all SNFs presumptively place all newly admitted patients in the Ultra High RUGS level.

120.    Defendants required that at least 70% of all patients undergoing therapy were on "Ultra-High" and 25% were on Very High.

121.    These RUG level requirements had no relation to patient medical necessity.

122.    Relator Saffarian was required by Encore to set therapy minutes without medical records and without evaluation of the therapists or progress notes.

123.    The implementation of the 70%/25% requirements by Encore was forceful and communications on the issue were almost daily with Therapy Program Managers, including Relator Saffarian.

124.    A review of the data released by CMS on RUG levels at SNFs throughout the United States shows that patients at Bay Shores and the other NexCare facilities are presumptively placed in the highest RUG level categories of Ultra High and Very High. A summary of the data relating NexCare facilities serviced by Encore is contained in the following chart:

| Provider ID | Facility Name | Street Address | City | State | Zip Code | RV Assessment Denominator | Percent of RV Assessments within 10 minutes of Threshold | RU Assessment Denominator | Percent of RU Assessments within 10 minutes of Threshold |
|---|---|---|---|---|---|---|---|---|---|
| 235388 | BAY SHORES SENIOR CARE AND REHAB CENTER | 3254 E MIDLAND RD | BAY CITY | MI | 48706 | 160 | 87% | 333 | 94% |
| 235256 | DIMONDALE NURSING CARE CENTER | 4000 N MICHIGAN ROAD | DIMONDALE | MI | 48821 | 83 | 59% | 160 | 83% |
| 235123 | DURAND SENIOR CARE AND REHAB CENTER, L L C | 8750 E MONROE RD | DURAND | MI | 48429 | 91 | 82% | 158 | 89% |
| 235054 | EVERGREEN MANOR SENIOR CARE CE | 111 EVERGREEN | BATTLE CREEK | MI | 49015 | 49 | 67% | 64 | 78% |
| 235445 | FAIRLANE SENIOR CARE AND REHAB CENTER | 15750 JOY | DETROIT | MI | 48228 | 60 | 85% | 212 | 96% |
| 235359 | FAITH HAVEN SENIOR CARE CENTRE | 6531 W MICHIGAN AVENUE | JACKSON | MI | 49201 | 49 | 67% | 137 | 88% |
| 235606 | FISHER SENIOR CARE AND REHAB | 521 OHMER RD | MAYVILLE | MI | 48744 | 48 | 92% | 110 | 96% |
| 235467 | FOUR CHAPLAINS NRSG CARE CTR | 28349 JOY RD | WESTLAND | MI | 48185 | 136 | 73% | 184 | 89% |
| 235279 | HOLT SENIOR CARE AND REHAB CENTER, L L C | 5091 WILLOUGHBY ROAD | HOLT | MI | 48842 | 79 | 61% | 305 | 89% |
| 235320 | LAHSER HILLS CARE CENTRE | 25300 LAHSER RD | SOUTHFIELD | MI | 48034 | 79 | 56% | 224 | 86% |
| 235547 | LAKEPOINTE SENIOR CARE AND REHAB CENTER, L L C | 37700 HARPER AVENUE | CLINTON TOWNSHIP | MI | 48036 | 77 | 74% | 223 | 94% |
| 235207 | OAKPOINTE SENIOR CARE AND REHAB CENTER | 18901 MEYERS RD | DETROIT | MI | 48235 | 108 | 81% | 230 | 95% |
| 235113 | SAGINAW SENIOR CARE AND REHAB CENTER, L L C | 4322 MACKINAW ROAD | SAGINAW | MI | 48603 | 100 | 92% | 111 | 99% |
| 235384 | SCHNEPP SENIOR CARE AND REHAB CENTER | 427 E WASHINGTON | SAINT LOUIS | MI | 48880 | 38 | 66% | 194 | 88% |
| 235065 | SOUTH LYON SENIOR CARE AND REHAB CENTER, L L C | 700 REYNOLD SWEET PARKWAY | SOUTH LYON | MI | 48178 | 43 | 88% | 221 | 100% |
| 235374 | WEST OAKS SENIOR CARE & REHAB CENTER | 22355 W EIGHT MILE RD | DETROIT | MI | 48219 | 44 | 80% | 113 | 75% |
| | | | | | | 1,244 | | 2,979 | |
| Column G= Total number of RV assessments in CY 2013. | | | | | | | | | |
| Column H= Number of RV assessments with total therapy minutes (OT, PT and ST) in the 500-510 range divided by the total number of RV assessments. | | | | | | | | | |
| Column I= Total number of RU assessments in CY 2013. | | | | | | | | | |
| Column J= Number of RU assessments with total therapy minutes (PT, OT and ST) in the 720-730 range divided by the total number of RU assessments. | | | | | | | | | |

**Encore, NexCare and NexCare SNFs harmed patients by forcing them to engage in high levels of unnecessary therapies they could not tolerate**

125.    As Therapy Program Manager, Relator Saffarian felt that he had responsibility to ensure the safety of patients, a big percentage of which (at least 40%) did not need and could not tolerate such levels of RUG placement.

126.    Accordingly, Relator Saffarian frequently complained to his supervisor, Mr. Raymond, that the patients simply could not physically tolerate the rigors of the highest therapy minutes UH and VH because most of the patients treated by the therapists are older and chronically ill.  His complaints were to no avail.

127.    The conflict between ensuring that no patient was pushed too far and complying with his employer's mandate that all new admissions be placed on Ultra High RUG levels became a prominent issue and problem in 2014, when therapists increasingly reported to Relator Saffarian that patients could not tolerate the amount of therapy assigned to them, which was generally either Ultra High or Very High RUGS categories.

128.    When Relator Saffarian reported these problems to Defendants, he was instructed to keep the patient on Ultra High and to make sure that his team "got the minutes" despite the obvious tolerance issues.

**Patient Examples**

129.    Relators Saffarian and Theile both have specific and independent knowledge that Patient A's therapy was unrelated to his individual medical needs.

a.      Patient A was a 92-year-old Med A patient who entered Bay Shore on 05/15/2015 with a number of serious health issues, including cardiac arrhythmia

27

(improper beating of the heart, whether irregular, too fast, or too slow), cardiomyopathy, and syncopal episodes. Patient A was Oxygen dependent on 3-6L.

b.      Patient A was placed on Very High RUG levels between 05/15/15 to 05/22/15 and was increased to Ultra High between 05/23/15 to 06/01/15.

c.      After receiving a total of 31 therapy sessions, Patient A was discharged to the hospital due to hypoxia, lethargy and pulse oxygen levels being in the 70s.

d.      On 06/05/15, Patient A was once again admitted to Bay Shores and placed on Very High RUG levels until 07/26/2015.

e.      The PT and OT reports continuously indicated that Patient A was very sleepy, lethargic, and increasingly fatigued. Patient A was also noted to have felt weaker and have decreased endurance to therapy.

f.      Patient A's participation in therapy sessions was poor and his compliance varied depending on how lethargic he felt. At one point, the physical therapist notes "Pt. not fully awake during treatment…he was in and out of sleep."

g.      After receiving a total of 78 therapy sessions on Very High RUG, Patient A expired under Bay Shore's care.

h.      Relators Saffarian and Theile both have specific and independent knowledge that Patient B received treatment immediately at Ultra High RUG, without clinical justification.

130.    Patient B was an 83-year-old Med A patient who entered Bay Shore on 11/5/2015 with a number of serious health issues, including lung cancer, which had spread, to her

brain, breast cancer, a heart condition, and seizure activity. Patient B displayed confusion and her respiratory status was compromised requiring her to use oxygen.

     a.     The OT progress notes of 11/12/15 to 11/18/15 and 11/19/15 to 11/25/15 reveal that Patient B's potential for achieving goals was "Guarded."

     b.     On 11/19/15, the OT daily note by Relator Theile indicated that Patient B required increasing assistance with bed mobility, transfers and activities of daily living and that her progress was "Guarded".

     c.     Patient B had a history of pulmonary adenocarcinoma, which had spread, to her brain.  One month before Patient B's treatments at Bay Shores, she received gamma ray radiation treatments for her brain cancer, which resulted in seizure activity.

     d.     Despite her compromised lung capacity and reliance on oxygen, Patient B was placed on UH RUGS level of therapy.

     e.     On 11/17/15 Patient B received seventy (70) minutes of physical therapy services and eighty-five (85) minutes of Occupational therapy and thirty (30) minutes of SLP services for a total of two hundred and ten (210) minutes, more than three and one half (3.5) hours of therapy.

     f.     Patient B actually received forty-three (43) days of therapy at Bay Shores.

     g.     According to the ALOS Details Report, from 11/25/15 to 11/29/15, Patient B received seventeen (17) PT treatments, seventeen (17) OT Treatments, and nine (9) ST treatments at Bay Shores.

h.      The PT Service Log Matrix indicates that Patient B's end of care date was 11/26/2015 and that from 11/5/15 through 11/26/2015 she was in the highest RUGS level of treatment RU.

i.      The OT service log matrix shows Patient B's last day of treatment on 11/27/2015.

j.      PT noted Patient B's fluctuating health status and therapy progress in the medical records.

k.      OT noted Patient B's increasing fatigue and decline.

l.      Patient B died at Bay Shores on 11/27/2015.

131.    Relators Saffarian and Theile both have specific and independent knowledge that Patient C immediately received treatment at Ultra High RUG levels, without any clinical justification.

a.      Patient C was an 81-year-old Part A HMO patient who entered Bay Shores on 04/26/14 with a number of serious health issues including: CAD (chronic artery disease), CHF (chronic heart failure), dementia, hepatic encephalopathy (the loss of  brain function when a damaged liver doesn't remove toxins from the blood), toxic metabolic encephalopathy (a broad category that describes abnormalities of the water, electrolytes, vitamins, and other chemicals that adversely affect brain function), right eye blindness due to cataract, Type 2 diabetes, HTN (hypertension), and wore a pacemaker.

b.      On 05/05/14, the OT Treatment encounter notes indicated Patient C as being "very  lethargic today," and according to the PT Treatment Encounter notes, the patient remained lethargic on 04/06/2014 and 04/07/2014.

c.  On 05/08/14, the PT encounter notes for Patient C indicated "PT had difficulty arousing…Pt not appropriate for mobility due to decreased alertness."

d.  On 05/13/14, the PT encounter notes for Patient C indicated "pt. doing better with therapy but very sleepy during afternoon session," and on 05/19/14 the patient is said to be "declining medically."

e.  According to the ALOS report, Patient C received thirty-six (36) therapy sessions, nineteen (19) in PT and seventeen (17) in OT.

f.  According to the Service Log Matrix, Patient C received therapy until 05/20/14.

g.  Patient C received therapy a total of twenty-six (26) days, during which time he was   on RU for fourteen (14) days and on RV for twelve (12) days.

h.  Patient C remained at Bay Shores until 05/25/2014 on Non-R levels.

i.  Patient C died due to decline in his medical condition.

132.  Relators Saffarian and Theile both have specific and independent knowledge that Patient D received treatment immediately at Ultra High RUG, without clinical justification.

a.  Patient D was an 86-year-old Medicare Part A patient who entered Bay Shores on 03/06/16 with a number of serious health issues, including: non-Hodgkin lymphoma, with two (2) rounds of chemotherapy secondary to bone mets (bone metastasis), coronary artery disease (CAD), COPD, gastroesophageal reflux disease (GERD), diabetes, hypertension and suffering from syncopal episodes and a-fib with rapid vent response. Patient D was Oxygen dependent on 3L and was examined to be very lethargic.

31

b.      Patient D had been recently hospitalized on 02/28/16 due to a syncopal episode, atrial fib, and seizure activity.

c.      The PT encounter notes of 03/22/16 reveal that Patient D was "very tired and lethargic" and on 03/27/16 he seemed "more weak" [sic].

d.      The OT therapy progress report of 03/07/16 indicated that Patient D felt fatigued, and the encounter notes of 03/18/16 stated that the patient demonstrated decreased activity and an increase in shortness of breath.

e.      Patient D's PT progress report of 03/25/16 to 03/31/16 indicated that "little if any progress in therapy has been made due to medical conditions."

f.      According to the PPS Billing report, Patient D was on Ultra High levels of therapy for twenty (20) days, before being reduced to Very High on 03/26/16.

g.      Patient D remained on this Very High level until 04/04/16 when he was discharged to the hospital due to becoming "unresponsive and unconscious."

133.   Relators Saffarian and Theile both have specific and independent knowledge that Patient E received treatment immediately at Ultra High RUG, without clinical justification.

a.      Patient E is a 78-year-old Med A patient who entered Bay Shores on 01/08/16 with a number of serious issues, including: COPD, CHF (chronic heart failure), end stage renal disease for which he in on dialysis, CAD (chronic artery disease), afib, dementia, fatigue, and respiratory distress. Patient E had reduced cognition and was oxygen dependent.

b.      According to his PPS Billing report, Patient E was on Ultra High for thirty-three (33) days, before being reduced to Very High between 02/20/16 to 02/29/16.

c.      Patient E's ALOS report indicated that he received a total of one hundred and seven (107) therapy sessions, before being discharged to the hospital on 03/01/2016 due to shortness of breath, respiratory distress, afib, and multiple other medical issues.

d.      Patient E re-entered Bay Shores on 03/14/16 and was again immediately placed on Ultra High Rug Levels.

e.      Patient E started not feeling well on 03/28/16 according to the OT and PT encounter notes, and demonstrated a health decline with inability to respond verbally and to tactile cueing.

f.      His health status impeded participation, and on 03/29/16 Patient E was once again discharged to the hospital after receiving a total of thirty (30) therapy sessions on Ultra High.

134.    Relators Saffarian and Theile both have specific and independent knowledge that Patient F received treatment immediately at Ultra High RUG, without clinical justification.

a.      Patient F was a 78-year-old Med A patient who entered Bay Shores on 02/12/15 after a recent hospitalization due to increased weakness, UTI, fall, and dizziness at home.

b.      Patient F has number of serious medical issues, including: COPD with core pulmonale, PAD (Peripheral artery disease), severe chronic hydrocephalus

33

(build-up of fluid in the cavities deep within the brain), dementia, atrial fib and hypertension. Patient F had reduced cognition and was Oxygen dependent.

c.    According to his PPS Billing report, Patient F was placed on Ultra High for thirty-eight (38) days.

d.    During this thirty-eight (38) day Ultra High treatment period, according to his ALOS report, Patient F received a total of sixty-nine (69) therapy sessions, before being discharged to the hospital on 03/22/15, again due to increased weakness,    shortness of breath, UTI, exacerbation of COPD, bronchitis, possible chronic congestive heart failure, and elevated BPN.

e.    Patient F re-entered Bay Shores on 03/27/15 and was again immediately placed on Ultra High Rug Levels.

f.    Patient F's PT progress report of 03/30/15 mentioned that he was feeling fatigued and on 05/20/15 the patient was yet again discharged to the hospital.

g.    Patient F was on Ultra High level for fifty-three (53) days and received a total of eighty-one (81) therapy sessions.

135.    Relators Saffarian and Theile both have specific and independent knowledge that Patient G received treatment immediately at Ultra High RUG, without clinical justification.

a.    Patient G was an 88-year-old Med A patient who entered Bay Shores on 05/15/14 with a number of serious health issues, including: breast cancer, seizure disorder, hypothyroidism, A-fib, Chron's disease, CVA (Damage to the brain from interruption of its blood supply), hypertension, SSS (sick sinus syndrome) with pacemaker placement, and mitral valve replacement. Patient G was Oxygen

34

dependent and reported nausea during the evaluation. In addition, she had been recently hospitalized due to confusion and seizure activity.

b.      Patient G's PT therapy progress notes of 05/30/14 to 06/05/14 indicated that she was experiencing dizziness on 06/03/14 and that her Oxygen levels dropped to 86-88% without oxygen use.

c.      Patient G's OT treatment encounter notes of 06/23/14 indicated that she was not feeling well, and she also has been diagnosed with pneumonia, which leads to an increase in coughing.

d.      According to the PPS Billing report, Patient G was on Ultra High Rug levels for thirty-seven (37) days, during which she received a total of sixty-nine (69) therapy sessions before she died on 06/23/14.

136.    Relators Saffarian and Theile both have specific and independent knowledge that Patient H received treatment immediately at Ultra High RUG, without clinical justification.

a.      Patient H was a 95-year-old Med A patient who entered Bay Shores on 01/09/15 with a number of medical issues, including: uterine cancer, metastasis to the stomach and colon, microvascular brain disease, GI Bleed, A-fib, anemia, and hypertension. She had recently been sent to the hospital due to weakness and decreased hemoglobin levels to 4.8.

b.      In the 01/09/15 to 01/15/15 PT progress notes it was reported that Patient H's legs felt weak and by the 01/23/15 to 01/29/15 report she needed frequent rest breaks.

35

c.      Both the PT and OT discharge summaries indicated that Patient H had a significant decline in her medical condition.

d.      According to the PPS Billing report, Patient H received Ultra High therapy for thirty-one (31) days, for a total of fifty-nine (59) therapy sessions indicated in her ALOS report.

e.      Patient H was transferred to hospice care due to her condition on 02/09/15.

137.   Relators Saffarian and Theile both have specific and independent knowledge that Patient I received treatment immediately at Ultra High RUG, without clinical justification.

a.      Patient I is a 79-year-old Med A patient who entered Bay Shores on 09/03/14 with a number of serious health issues, including severe bradycardia and chronic renal failure. He had been recently hospitalized 08/15/15 to 09/03/15 due to altered sensorium with severe bradycardia, hypotension, and hypothermia.

b.      The PT encounter notes of 09/25/14 and 10/10/14 reveal that Patient I was beginning to not feel well secondary to weakness and having low hemoglobin levels. His participation was decreasing and he was experiencing a medical decline. The PT therapist stated the patient "would have a difficult time tolerating this much therapy secondary to his condition."

c.      According to his PPS Billing report, Patient I received therapy on Ultra High for a total of thirty-six (36) days before he was reduced to High between 10/09/14 to 10/24/14 and later to Non-R for the remaining of his stay at Bay Shore.

d.      Patient I expired on 10/31/14 due to his declining condition.

36

138.    Relators Saffarian and Theile both have specific and independent knowledge that Patient J could not tolerate the Very High and Ultra High levels of therapy which was administered without clinical justification.

      a.     Patient J was an 83-year-old Med A patient who entered Bay Shores on 06/13/15 with a number of medical issues, including CHF (chronic heart failure), ASHD, (arteriosclerotic heart disease—the thickening and hardening of the walls of the coronary arteries), MI 7/14 with cardiac cath and stent, depression, hyperlipidemia, and dementia. He was Oxygen dependent.

      b.     Patient J was hospitalized on 05/29/15 due to pneumonia, difficulty breathing with oxygen saturated levels in the 60%, prerenal azotemia, elevated troponin levels, and progressive thrombocytopenia.

      c.     Patient J was placed on Very High levels between 06/13/15 to 06/20/15.

      d.     At this Very High level of therapy, according to the PT treatment encounter notes of 06/16/15, the Patient J's oxygen levels needed to be increased from 2L to 3L in order for the therapy to begin.

      e.     Patient J was then increased to Ultra High between 06/21/15 to 07/04/15.

      f.     After Patient J's increase to Ultra High therapy, the physical therapist noted on 06/24/15 that the "patient demonstrates low endurance with labored breathing after standing up for thirty (30) sec duration. O2 stats drop when standing to 86% although able to recover to 90% after 1 min with cues of proper breathing."

g.    The occupational therapist noted on 06/27/15 that the therapy session needed to be split into different sessions throughout the day in order for Patient J to tolerate the therapy he was receiving.

h.    According to the PPS Billing report, Patient J was on Ultra High levels for fourteen (14) days.

i.    The ALOS report indicates that Patient J received a total of forty-three (43) therapy sessions at Bay Shores, before being discharged to the hospital on 07/04/15 as a result of his medical condition.

j.    Further review of the PPS Billing and the ALOS reports indicates that Patient J returned to Bay Shores on 07/08/15 and was immediately placed on very High RUG levels.

139.   These patients are representative of Defendants' practices.  There are many more examples of the foregoing.

**Encore, NexCare, and SNFs delayed patient discharges to increase the amount of Medicare reimbursements**

140.   When patients completed their course of therapy, the therapists recommend their discharge. However, Defendants blocked and/or delayed patient discharges.

141.   The timing of a patient discharge was decided by NexCare, which had a policy that there could be no discharge of patients from therapies without a seven (7) day notice of the recommended discharge given to the SNF administration.

142.   Further, therapists were not allowed to discharge more than two (2) patients per day, regardless of patient need.

143.    "Margaret("Maggie") Tascarelli, the Bay Shore administrator, instructed Relator Saffarian and his staff on numerous occasions during their weekly meetings that she did not want more than two (2) discharges per day.

144.    Margaret ("Maggie") Tascarelli told Relator Saffarian that it was easy to replace two (2) discharges with two (2) new admittees on the same day, but that it would be difficult to discharge more than two (2) patients and expect that many admits on the same day.

145.    Further, the Relators have direct and personal knowledge that the therapy staff was not allowed to provide seven (7) day notice of discharges after Wednesday of each week.

146.    The Relators have direct and personal knowledge that the patients stayed in therapy if the therapy staff missed the seven (7) day notice by Wednesday mandate regardless of medical necessity.

147.    The practical result on these limitations was that patient discharges were not driven by medical necessity or completion of their therapies, but rather by the Defendants' desire to maintain their census without regard to medical necessity    and   in accordance with the policies and procedures set by Encore, NexCare, and the SNFs.

148.    The Relators have direct and personal knowledge that failure to comply with the delayed discharge policy was the subject of significant reprimand.

**Defendants Mandate that 25-40% of Part B eligible patients must be on the daily caseload regardless of patient need and requires therapists to "troll" for patients**

149.    Since early 2015, Defendants have established and implemented strict mandates that a minimum of 40% of all Part B patients receive skilled therapy from Encore therapists, which have no relationship to patient medical needs.

150.    Prior to 2015, Encore's Part B mandate was that 25% of all Part B patients receive skilled therapy.

151.    The minimum percentage utilization mandate/s violates Medicare regulations, which state that Medicare covers only those services that are reasonable and necessary for the diagnosis or treatment of illness or injury.

152.    Encore provided training to its therapists on achieving the Part B mandates, which were enforced.   For example, Ruth Cenova-Wotring ("Wotring"), PTA, the Part B Coordinator for Encore, travels to all SNFs from her home office in Indiana to instruct Encore employees on finding and skilling patients in Part B to push Part B numbers up.

153.    On February 16, 2015, Relators attended one of Wotring's "training" sessions at Bay Shores called "Part B Utilization Meeting."     In that session, Wotring instructed the Encore staff on increasing their Part B caseload:

    a.      Wotring said that the practices that she recommended are utilized company-wide at Encore.

    b.      Wotring explained that in order to meet the 40% requirement for Part B Medicare patients, therapists were to look at the "802 reports" for patients with pain management, falls, falls with fractures, weight loss, and weight gain.

    c.      Wotring recommended that the therapists contact the Encore Chattanooga office for instructions on the use of ultrasound device and E-stimulation to

40

receive an in-service training on how to use ultrasound and e-stim devices on Part B patients.

d.      Wotring gave instructions to "look at every patient who has not been on therapy for sixty (60) days and told therpists to evaluate all such Part B patients, even if they have not had any functional changes.

e.      Wotring stated that it was worth doing such evaluation and get credit for it because it counted towards obtaining the 40% Part B goal, as well as  evaluation minutes for Part B patients counting towards "productivity."

f.      Wotring told therapists to evaluate every dementia patient in order to get a baseline Allen level to facilitate therapy placement.

g.      Wotring told the group that the "mindset" of the Bay Shore Administration, (NexCare) is that every person who enters the building with Medicare Part A benefits would be picked up by therapy and always put into the Ultra High RUGS category.

154.    During a private meeting the same day, Wotring provided the following instructions to Relator Saffarian:

a.      Worting directed Relator Saffarian to evaluate instead of screening Part B patients because evaluations were billable to Part B whereas screenings were not.

b.      Wotring instructed Relator Saffarian to contact Encore's Rehab department in Chattanooga in order to have the staff trained in the use of the electrical stimulation machine as they could use this to pick up Part B patients for pain management.

41

c.    Wotring instructed Relator Saffarian to have his staff perform Allen
Cognitive tests on the Part B patients because this was the easiest and best way to
pick up more Part B. patients.

155.    The Part B mandate was reinforced by Relator's supervisor Greg Raymond at the
monthly meetings he attended at the home office, through emails and other
communications from Encore, and through Encore direct training.

156.    In addition to trolling Part B, Defendants required therapists to provide 3 to 4
CPT units (45 to 60 minutes) to Part B patients, regardless of medical necessity of the
patient or clinical complexity of the therapy provided.

157.    Defendants imposed adverse employment actions against therapists who failed to
comply with the mandates.

### Encore's 85% Daily "Productivity" Requirement for all Therapists Caused False Billings

158.    Encore has a company-wide mandate that each therapist must meet an 85% daily
"productivity" requirement and COTAS, PTAs, and per diems must meet a 90%
"productivity" requirement.

159.    Productivity in this instance is defined by Encore as "treatment time divided by
onsite time."

160.    Encore has a strict policy that there can be no overtime without written approval
from divisional managers.

161.    This productivity mandate causes therapists to bill Medicare for minutes of
therapy that are not actually provided because Encore limits the therapists' work week to
forty (40) hours, such that it is impossible for therapists to complete all of the therapy
minutes for which they bill.

162.    The treatment of patients requires a number of ancillary duties, which consume time in an average eight (8) hour day of therapies.

163.    Some of the ancillary duties and activities include a five (5) to ten (10) minute meetings to discuss facility and patient issues; therapists washing their hands between each patients, which can take a few minutes if done correctly; transporting residents to and from therapy which can take from two to five (2-5) minutes per patient; finding wheelchairs and cleaning them properly to avoid illness of patients; filling the water pitchers; charging the computers; communicating with assistants who co-sign the charts; interacting in the hall on their way to get patients by other patients, nurses or family members; completing documentation; and answering the department's phone; among other representative tasks.

164.    Mathematically, a therapist cannot complete these tasks and complete her therapies. In an eight (8) hour workday, there are a total of four hundred and eighty (480) minutes. The company allows two (2) fifteen (15) minute breaks for the staff who work a minimum of six (6) hours per day, which allows for the therapists to use    the    bathroom and to get a snack. This leaves four hundred and fifty (450) minutes for treatment.

165.    In order to work an 8-hour day (480 minutes) and be 85% productive, a therapist must have at least 408 billable minutes (480 x 0.85 equals 408 minutes), which leaves a total of 72 minutes to take their break and do all other tasks.   Once the therapist's two 15-minute breaks are subtracted, the therapist has 42 minutes left per day to handle the many ancillary but essential tasks outlined, which is an impossibility.

166.    However, if a therapist treats nine (9) patients in a day, which is common (It would not be unusual for therapists to see fifteen (15) patients in one day on a weekend),

and as required, washes their hands between each patient, hand washing alone would take an additional thirty (30) minutes, leaving only twelve (12) minutes of their entire eight (8)-hour day to handle every other task outside the actual therapies.

167.    Transporting residents to and from therapy which can take from two to five (2-5) minutes per patient; finding wheelchairs and cleaning them properly; filling the water pitchers; charging the computers; communicating with assistants who co-sign the charts; interacting in the hall on their way to get patients by other patients, nurses or family members; completing documentation; and answering the department's phone; among other representative tasks; cannot be completed in twelve (12) minutes.

168.    To achieve 90% productivity, COTAs, PTAs, and per diem staff need 432 billable minutes (480 minute x 0.90 equals 432 minutes), which leaves a total of 48 minutes to take their break and do all other tasks.  Once they take their two 15-minute breaks, they only have 18 minutes left per day to handle the many ancillary but essential tasks outlined, which is an impossibility.

169.    The purpose and clear outcome of these "productivity" requirements is that Medicare is billed for significant amounts of therapy time each day which time is not actually used to provide therapy, but rather to perform non-billable tasks.

170.    The implications for employees including Therapy Program Managers and therapists for non-compliance with company productivity mandates were severe.

171.    Relator Saffarian, himself, was demoted for unlawful and retaliatory reasons, including non-compliance with the productivity mandates.

### Defendants Mandated a Minimum Average Daily RUG of $500 Regardless of Medical Need

172.    Encore, NexCare, and named SNF facilities all mandated minimum "Average Daily RUG " (ADR) of $500.

173.    The ADR is determined monthly based on the total amount billed to Medicare for the month divided by the total number of RUG days during that month.

174.    This ADR determination is an important metric which is rigidly implemented as to each SNF which is directly tethered to the requirement that 70% of the patients in treatment be on the Ultra High (UH) category and that 25% of the patients be at Very High (VH), regardless of individual patient needs.

175.    Relators have direct and personal knowledge that Margaret Tascarella's, NexCare Administrator for Bay Shores, had a categorical expectation that the ADR must exceed $500.

**Shifting the Number of Therapy Minutes between different Therapy Disciplines**

176.    Encore only allows overtime if an individual staff member and the department are a minimum of 85% productive in all therapy disciplines on a daily basis.

177.    Encore directed therapists to shift the number of therapy minutes to meet this 85% daily productivity requirement in all disciplines before overtime could be billed.

178.    Based on Relators' knowledge of the practices and procedures of Defendants, including but not limited to Relators' discussions with Encore's MDS coordinator, all of the fraudulent therapy services described herein were invoiced to Medicare by Bay Shores.

**COUNT ONE**
**Federal False Claims Act-Presentation of False Claim-31 U.S.C. § 3729(a)(1)(A)**

45

179.    Relators re-allege and incorporate paragraphs 1-178 of this Complaint as if fully set forth herein.

180.    This is a claim for penalties and treble damages under the Federal False Claims Act.

181.    In performing the acts described above, Defendants, through the acts of their officers, agents, and employees for the purpose of defrauding the Government, knowingly made or caused to be made false or fraudulent claims for payment to Medicare, Tricare, and other federal government health programs within the meaning of 31 U.S.C. § 3729(a)(1)(A).

182.    As a result, federal monies were lost through payments made in respect of the claims and other costs were sustained by the Government.

183.    Therefore, the Federal Government has been damaged in an amount to be proven at trial.

184.    Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants and arising from their fraudulent conduct as described herein.

## COUNT TWO
### Federal False Claims Act-False Statements-31 U.S.C. § 3729(a)(1)(B)

185.    Relators re-allege and incorporate paragraphs 1-178 of this Complaint as is fully set forth herein.

186.    In performing the acts described above, Defendants through the acts of their officers, agents, and employees knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid by the Government in violation of 31 U.S.C §3729(a)(1)(B).

187.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damages in an amount to be determined.

188.    Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim paid or approved arising from the Defendants fraudulent conduct as described herein.

**COUNT THREE**
**Federal False Claims Act-Conspiracy to Make False Claims and Statements-31 U.S.C. § 3729(a)(1)(C)**

189.    Relators re-allege and incorporate paragraphs 1-178 of this Complaint as is fully set forth herein.

190.    In performing the acts described above, Defendants through the acts of their officers, agents, and employees conspired and acted in concert to make, used, or caused to be made or used, false claims and statements to get a false or fraudulent claims paid by the Government in violation of 31 U.S.C §3729(a)(1)(C).

191.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damages in an amount to be determined.

192.    Additionally, the Federal Government is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim paid or approved arising from the Defendants fraudulent conduct as described herein.

**COUNT FOUR**
**Payment Under Mistake of Fact**

193.    Relators re-allege and incorporate paragraphs 1-178 of the Complaint as if fully set forth herein.

47

194.    This is an action to recover monies paid by the United States under a mistake of fact that was caused by Defendants through the activities described in the Complaint.

195.    The United States made payments under the erroneous belief that the records, statements, and proposed amount upon which reimbursement was based were true, correct and proper.

196.    The United States and the States' erroneous beliefs were material to the payments made by the Federal Government.

197.    Because of these mistakes of fact, the United States paid moneys for services that were not properly reimbursable and as to which the United States is entitled.

198.    By reason of these payments, the United States has suffered damages in an amount to be determined.

## COUNT FIVE
## Unjust Enrichment

199.    Relators re-allege and incorporate paragraphs 1-178 of the Complaint as if fully set forth herein.

200.    This is an action to recover monies by which Defendants have been unjustly enriched. Due to the Defendants improper practices, the United States paid monies by which Defendants have been unjustly enriched.

201.    By reason of its payments, the United States is entitled to damages in an amount to be determined.

## COUNT SIX
## Retaliation-31 U.S.C. § 3730(h)

202.    Relators re-allege and incorporate paragraphs 1-178 of this Complaint as is fully set forth herein.

203.    As a result of Relator Saffarian's efforts to stop Defendants' unlawful conduct, non- participation in Defendants' schemes, and lawful acts in furtherance of this action, Defendants, through the acts of their officers, agents, and employees, took adverse employment action against him.

204.    Defendants' adverse employment action was retaliatory

205.    Relator Saffarian was damaged in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for the following relief:

A.    Judgment in an amount equal to treble the damages to be proven at trial against Defendants and in favor of the United States, plus a civil penalty of up to $11,000 for each violation of 31 U.S.C. § 3729 proven at trial;

B.    Judgment in amount of proven damages at trial for payment in mistake of fact and unjust enrichment;

C.    An award to Relators of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and equivalent provisions in the state statutes set forth above, including the costs and expenses of this action and reasonable attorneys' fees;

D.    An award to Relator Saffarian for the maximum amount allowed pursuant to 31 U.S.C. § 3730(h), including twice the amount of back pay, interest on the back pay, and compensation for any special damages sustained by him, including litigation costs and reasonable attorney's fees.

E.    All such other, further and different relief, whether preliminary or permanent, legal, general or equitable, as the Court deems just and proper.

## JURY DEMAND

Relators hereby demand a trial by Jury in this matter.


Date___5/23/2016                    Respectfully submitted,


                                    Jeffrey A. Newman w/p
                                    Jeffrey A. Newman
                                    Law Offices of Jeffrey A. Newman & Associates
                                    One Story Terrace
                                    Marblehead, Ma. 01945
                                    Tel: 617-823-3217
                                    Fax: 781-639-8688
                                    Jeffrey.newman1@gmail.com



                                    Monica P. Navarro (P52985)
                                    Vezina Law Group
                                    280 N Old Woodward Ave, # LL20
                                    Birmingham, Michigan 48009
                                    Phone: (248) 558-2700
                                    Direct: (248) 558-2702
                                    Fax: (248) 232-1581
                                    mnavarro@vezinalaw.com